**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **STENNIE MEADOURS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. H – 04 – 102** |
| | § | |
| **STEVEN R. ERMEL, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

### I.     BACKGROUND

This case arises out of a police shooting that resulted in the death of Bob Meadours ("Meadours"). Plaintiffs, the parents and sister of Meadours, bring a claim under 42 U.S.C. § 1983 for excessive force against the City of La Porte (the "City"), and Sergeant Ermel, Officer Dalton, Officer Kominek, and Officer Martin (collectively, the "Officer Defendants").[1] Plaintiffs also bring state law claims against the Officer Defendants for gross negligence, assault and battery, and intentional infliction of emotional distress. Additionally, Meadours' sister, Katie Raterink, states a claim for bystander recovery.[2]

On October 29, 2001, Raterink called 911 to seek mental health assistance for her brother. The dispatcher sent a La Porte EMS unit and Officers Dalton and Martin to meet with Raterink. Officer Kominek voluntarily responded, as did Sergeant Ermel, the street supervisor on duty that evening. The officers met with Raterink at the end of a neighborhood street, where she explained that her brother was having delusions. In response to questions from the officers,

---

[1] Plaintiffs had also stated a § 1983 false arrest claim, but have conceded that *Linbrugger v. Abercia*, 363 F.3d 537, 541 & n.1 (5th Cir. 2004), is dispositive of this issue adversely to Plaintiffs and therefore have dropped that claim.
[2] Stennie Meadours, Meadours' mother, has dropped her bystander claim.

Raterink informed them that Meadours was a large man and that he had been working with tools and possessed a screwdriver, but was not armed.  Raterink explained that she waited in the street because she did not want her brother to suspect that she had been the one to call the police.  The officers told Raterink she could ride with them back to the house, but she would have to wait in the car.  Raterink declined the offer because she did not want to remain in the police car.

The Officer Defendants approached Raterink's house with the car lights turned off.  Based on his conversation with Raterink, Ermel believed that Meadours posed a danger to other persons who might come into contact with him, and determined that the police would need to assess that potential danger before the paramedics would be allowed to treat him.  Dalton and Martin approached the front door, while Kominek entered the backyard.  Either immediately before or immediately after the officers approached the house, the interior and exterior lights of the house turned off simultaneously – the parties disagree over the cause of this blackout.  Upon entering the backyard, Kominek saw Meadours swinging back and forth in a swing, with his back towards Kominek.  Meadours was wearing several baseball caps and a tool belt with a stuffed animal attached to it.

Kominek addressed Meadours and claims to have identified himself as a police officer when he was alone with him, but no other officer ever announced himself after that.   As Meadours stood up, Kominek claims he could see a screwdriver in Meadours' hand.  Kominek was joined by Dalton and Martin.  The three men, who were wearing navy uniforms and shining flashlights in Meadours' face, immediately drew weapons and commanded Meadours to drop the screwdriver.  When Meadours did not drop the screwdriver, Kominek radioed Ermel to bring the beanbag shotgun to the backyard.  A beanbag shotgun is a 12-gauge shotgun that fires beanbag rounds at a rate of about 90 m.p.h.  A person who is hit by a beanbag round might believe that he

has been shot with a real gun, creating fear that in turn produces a "fight or flight" response. A beanbag shotgun can cause death or serious bodily injury.

Ermel entered the backyard and ordered Meadours to drop the screwdriver; Meadours refused to do so. Ermel believed that Meadours was making threatening gestures with the screwdriver and thought it was necessary to take Meadours into custody because he was mentally ill. Ermel instructed the other officers to cover him as he fired the beanbag shotgun at Meadours; the beanbag round hit Meadours and caused him to run in fear from the officers. He jumped over a fence into the dog pen and jumped on top of a doghouse. Dalton, Martin, and Kominek pursued Meadours into the enclosed dog pen.

The officers again directed Meadours to drop his screwdriver; he did not. Ermel then fired two more beanbag rounds that hit Meadours. The officers claim that the third beanbag round knocked Meadours off of the doghouse, but forensic ballistic analysis indicates that a pistol shot from Dalton hit Meadours while on top of the doghouse and knocked him off. In any event, Meadours landed on his feet and began running toward the door leading to the garage. The Officer Defendants claim they thought that Meadours was charging at Kominek with the screwdriver. Dalton, Kominek, and Martin all opened fire with their automatic handguns and shot Meadours dead, firing a total of twenty-three shots and hitting him with fourteen. The shooting lasted a few seconds.

Raterink heard the shots from a few blocks away and feared that, because so many shots had been fired, her brother had shot the four police officers. She arrived on the scene about fifteen minutes later to see the paramedics pumping on a person's chest. When Raterink saw the four officers standing together, she realized that her brother had been the person shot.

II.   **PRELIMINARY MOTIONS**

   **A.  Motion for Sanctions and Objections to Summary Judgment Evidence**

As a preliminary matter, Plaintiffs have filed a Motion for Discovery Sanctions Against All Defendants requesting that the Court deny Defendants' Motions for Summary Judgment as a sanction for their obstruction of discovery relevant to the Motions.  The Motion for Sanctions is **DENIED**.

Defendants have filed Objections to Plaintiffs' Summary Judgment Record seeking to exclude a number of exhibits.  Defendants' objections are meritless and are therefore **DENIED**.

   **B.  Motion to Exclude Expert Testimony**

Plaintiffs have also filed a *Daubert* Motion to Exclude Testimony of Dr. Gary Deegear. Because Defendants use Dr. Deegear's expert opinion to support their Motions for Summary Judgment, the Court will address the Motion to Exclude prior to considering the Motions for Summary Judgment.

   **1.   *Daubert*[3] Standard**

Dr. Deegear is a medical doctor offered to provide expert testimony in the area of injury causation and biomechanics.[4]  In *Kumho Tire Co. v. Carmichael,* the Supreme Court held that district courts may apply the *Daubert* analysis to determine the reliability of experts generally:

> *Daubert*'s general holding – setting forth the trial judge's general "gatekeeping" obligation – applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.  We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.  But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.

---

[3] *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).
[4] Biomechanics is the "study of the mechanics of a living body, especially of the forces exerted by muscles and gravity on the skeletal structure."  *The American Heritage® Dictionary of the English Language*, Fourth Edition, copyright 2000 by Houghton Mifflin Company.

4

526 U.S. 137, 141-42 (1999) (citation omitted).  The Fifth Circuit specifically held that *Daubert*

applies to medical experts.  *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999) (stating

that *Kumho* supported the Fifth Circuit en banc decision in *Moore v. Ashland Chemical, Inc.*, 151

F.3d 269 (5th Cir. 1998), that the *Daubert* analysis governs expert medical testimony).

   In *Daubert* and *Kumho*, the Court listed specific factors that a trial judge may consider

when determining the admissibility of expert testimony.  Those factors are:

- Whether a "theory or technique . . . can be (and has been) tested";

- Whether it "has been subjected to peer review and publication";

- Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

- Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Kumho*, 526 U.S. at 149-50 (quoting *Daubert*, 509 U.S. at 592-94).  The goal of *Daubert* is to

"ensure the reliability and relevancy of expert testimony."  *Id*. at 152.  The *Daubert* inquiry is a

flexible one, however, and these factors "do *not* constitute a 'definitive checklist or test.'"  *Id.* at

150 (quoting *Daubert*, 509 U.S. at 593).  Using the *Daubert* factors as guidance, the Court finds

and holds that Dr. Deegear's expert testimony does not satisfy the Federal Rules of Evidence for

admissibility and should be excluded.

### 2.    Analysis

   Dr. Deegear has testified that his examination of the wound patterns of Meadours' body

is consistent with the Officer Defendants' account of the shooting incident.  Based on his

examination of Meadours' wound patterns and the effect of the wounds on Meadours' body, Dr.

Deegear has rendered opinions on the likely positions of the Officer Defendants and Meadours' body at the time the wounds were inflicted.

In recent years, Dr. Deegear has testified as an expert in several injury cases, but the majority of those cases involved accidents with power tools, child car seats, or burn incidents. Dr. Deegear has only rendered expert reports in shooting reconstruction cases approximately three or four times before this case, but he never provided testimony in any of those cases.    As Dr. Deegear himself admits, his method of injury causation analysis is different from most others.  He uses a method of pattern analysis that he developed on his own, which has not been written up, cannot easily be explained, and is a malleable model that can accommodate whatever he is evaluating.  Dr. Deegear explained during his deposition that his model is an analytical process that is all contained in his head:  "It's a process that I've developed and I've used in my analysis, but it's all a mental exercise."  Pls.' Mot. to Exclude Test., Tab. 4 at p.86.  Dr. Deegear stated that his model of pattern analysis has not been discussed with any other experts in the field, submitted to peer review critiques, or been accepted in the general scientific community. The rate of error on his pattern analysis is unknown.

Dr. Deegear's deposition testimony makes clear that none of the *Daubert* factors has been met.  His theory cannot be tested, has not been subjected to peer review and publication, and does not enjoy general acceptance within the scientific community; in fact, the scientific community is not even aware of the theory.  Dr. Deegear's opinion is simply not "the product of reliable principles and methods."  Fed. R. Evid. 702.  Furthermore, Dr. Deegear's methodology does not satisfy "any other factors operating in favor of admissibility which could outweigh those identified in *Daubert*."  *Food Lion*, 171 F.3d at 311.  Plaintiffs' Motion to Exclude

Testimony of Dr. Deegear is **GRANTED**; accordingly, the Court will not consider Dr. Deegear's opinions in evaluating Defendants' Motions for Summary Judgment.

## III.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law, based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations and citations omitted). A genuine issue of material facts exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*.

"[A] complete failure of proof concerning an essential element of [Plaintiffs'] case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for Defendants. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If Defendants show that there is a lack of evidence to support Plaintiffs' case, Plaintiffs "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Kee*, 247 F.3d at 210 (quotation and citation omitted).

## IV.   MUNICIPAL LIABILITY

Plaintiffs seek to hold the City liable, through the acts of its officers, for the death of Meadours. While a municipality can be found liable for constitutional violations under § 1983, § 1983 does not allow municipal liability on the basis of respondeat superior. *Piotrowski v. City of*

*Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability."  *Id*. (footnote omitted).  The Supreme Court and the Fifth Circuit have held that municipal liability under § 1983 requires proof of three elements:  (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom.  *Monell v. Dep't of Social Sciences*, 436 U.S. 658, 694 (1978); *Piotrowski*, 237 F.3d at 578.  The City cannot be held liable under § 1983 for the death of Meadours because Plaintiffs have not produced any evidence of an official policy.

Municipal liability requires that the deprivation of constitutional rights was inflicted pursuant to official custom or policy.  *Piotrowski*, 237 F.3d at 579.

> Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations.  But a policy may also be evidenced by custom, that is: [] a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy.

*Id*. (quotation and citation omitted).  Single incidents, however, do not demonstrate a policy or custom:

> Allegations of an isolated incident are not sufficient to show the existence of a custom or policy.  Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy.  To demonstrate a municipal custom or policy under § 1983, a plaintiff must at least allege:  a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent policy misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.

*Fraire v. Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) (quotations and footnotes omitted).

Plaintiffs do not point to any official City policy that caused the alleged § 1983 violation.  Rather, they argue that the single incident of which they complain demonstrates a de facto policy

authorizing the use of excessive force against the mentally ill.  Plaintiffs have not, however, provided evidence of any other incidents that would suggest a custom or policy of misconduct.

Plaintiffs rely on two facts to show that the City engages in a pattern of deliberate indifference to constitutional rights:  (1) the telephone conversation between Plaintiff Raterink and the City's 911 dispatcher; and (2) the lack of disciplinary action against any of the Officer Defendants as a result of their shooting Meadours.

Raterink called 911 to get help for her brother, Meadours, whom she described to the dispatcher as being paranoid and delusional.  During the conversation, Raterink expressed her hesitation to call because she was concerned that the police would hit her brother.  The dispatcher replied that she did not like the insinuation that the police would hit Raterink's brother and stated, "They [the police] have to do what they have to do to get him in their car."  Pls.' Resp. to Defs.' Mot. for Summ. J. at 5.  Plaintiffs contend that this conversation with the dispatcher reasonably implies that the City has a standing custom and practice of detaining mentally ill citizens without a warrant, without probable cause, and through the use of excessive force.  The Court disagrees.  The dispatcher's comment is not sufficient evidence to raise a genuine issue of material fact as to the existence of any City custom or policy.

Plaintiffs also allege that an unconstitutional custom can be inferred from the City's failure to discipline the Officer Defendants for the shooting of Meadours.  The Fifth Circuit has repeatedly rejected this argument, holding that the failure to discipline on a single occasion is not sufficient to prove a custom or policy that is the moving force behind the alleged unconstitutional violation.  *Fraire*, 957 F.2d at 1278-79.

Because Plaintiffs cannot show the existence of an official policy or custom that caused the alleged constitutional violation, the City is entitled to summary judgment.

**V.      OFFICER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Officer Defendants seek qualified immunity from Plaintiffs' § 1983 claim.  A court considering the defense of qualified immunity engages in a two-part inquiry.  First, this Court must determine whether, viewing the facts in the light most favorable to Plaintiffs, there was a violation of a constitutional right.   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   If no constitutional right has been violated under the alleged facts, then the qualified immunity inquiry ends.  *Id*.  If a constitutional violation is shown, the Court must then determine whether the right was clearly established.  *Id*.

In the Fifth Circuit, the defense of qualified immunity involves a shifting burden of proof. *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992).  The Officer Defendants must plead their good faith and establish that they were acting within the scope of their discretionary authority. *Id*.   The burden then shifts to Plaintiffs to rebut the defense by establishing that the Officer Defendants' conduct violated clearly established law.  *Id*.  The Officer Defendants have claimed qualified immunity and established that they were acting within their authority as police officers; therefore Plaintiffs bear the burden of demonstrating that the Officer Defendants violated clearly established law.

The Officer Defendants cite *Jacobs v. West Feliciana Sheriff's Department* for the principle that each officer's entitlement to qualified immunity must be considered separately from that of the others.  228 F.3d 388, 395 (5th Cir. 2000) ("[P]rudence and our own precedent dictates that we examine each individual defendant's entitlement to qualified immunity separately.")  In *Jacobs*, however, the court reasoned that it was inappropriate to evaluate the conduct of the three defendants collectively because the defendants did not act in unison.  *Id*.

The facts of this case differ in that the Officer Defendants did act in unison; therefore it is not improper to consider their actions together.

Plaintiffs allege that the Officer Defendants used excessive force in their dealings with Meadours.  Claims that law enforcement officials used excessive force in seizing a free citizen are analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  To prevail on a Fourth Amendment excessive force claim, Plaintiffs must first show that there was a seizure.  *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).  "An officer seizes a person when he, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *Id*. (emphasis removed) (quotation and citation omitted).  Next, Plaintiffs must show:  "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable."  *Id*.

### A.  Constitutional Violation

The facts clearly establish that Meadours was seized when the Officer Defendants surrounded him in his backyard, pointed guns at him, shot him with beanbag rounds, and eventually shot him fatally with three automatic pistols.  Meadours' death resulted directly and only from the Officer Defendants' acts of shooting him.[5]  The main inquiry before the Court, then, is whether the Officer Defendants' use of force was objectively unreasonable.

"To gauge the objective reasonableness of the force used by a law enforcement officer, [the Court] must balance the amount of force used against the need for force.  This balancing test

---

[5] Ermel tries to distinguish himself from the other Officer Defendants by arguing that he shot Meadours with only a beanbag shotgun and did not cause him any injury.  Ermel's actions, however, significantly contributed to the death of Meadours; viewing his actions in isolation is illogical. *See Flores*, 381 F.3d at 398 (stating that a court must look at the totality of the circumstances to determine whether a seizure was objectively reasonable).  Furthermore, there is evidence that use of a beanbag shotgun can cause death or serious bodily injury.  Use of deadly force was not objectively reasonable when Ermel fired the beanbag rounds.

requires careful attention to the facts and circumstances of each particular case."  *Id*. at 399 (quotations and citations omitted).  Because the Officer Defendants used deadly force, the "objective reasonableness" balancing test is constrained.  *Id*.  "It is objectively unreasonable to use deadly force 'unless it is necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  The Court must evaluate the facts from the point of view of a "reasonable officer on the scene" who is forced to make quick judgments in tense and uncertain circumstances about the amount of force that is necessary in a particular situation.  *Id*.

Ermel argues that shooting Meadours three times with a beanbag shotgun – which could constitute deadly force – was objectively reasonable because it was impossible for the four officers to subdue Meadours in any other way in order to take him into custody, and he feared that Meadours might escape into the neighborhood and inflict harm on others.  Dalton, Kominek, and Martin argue that their use of deadly force was objectively reasonable because they believed that Meadours was charging at Kominek with the intent to kill him.

Viewing the facts in the light most favorable to Plaintiffs, Meadours, who appeared to be in a mentally unstable condition, was suddenly surrounded in his own backyard by four men pointing guns at him and shouting at him to drop his screwdriver.  While Kominek alone claims to have identified himself as a police officer, the area was dark, making it difficult or impossible for Meadours to see that the men were police officers.  Ermel's beanbag tactics – which, at most, constitute deadly force and, at least, exacerbated an already tense situation – caused Meadours to retreat in fear from the officers.  When Meadours attempted to run for the safety of his garage,

after being knocked off the dog house by either the third beanbag round or an actual bullet, he was shot at more than twenty times and killed.

The Court has difficulty reconciling the fact that four reasonable officers, who arrived at the home of a disturbed man with the intention of taking him into custody to get mental health assistance, had to resort to tactics that led to the death of the man they were trying to help. The Officer Defendants did not appear to have a coherent plan for dealing with Meadours, and almost immediately employed the use of the beanbag shotgun. The Officer Defendants argue that the beanbag shotgun was the only available alternative because they feared injury if they got too close to Meadours. The assertion that four trained officers had no other recourse than use of a beanbag shotgun – the purpose of which is to make the victim believe he has been shot with a real gun – is not one that the Court is prepared to adopt, at least not in the context of a motion for summary judgment.

Furthermore, the only people Meadours conceivably posed a threat to were the Officer Defendants, who, in effect, unreasonably created the situation in which they felt threatened. *See Flores*, 381 F.3d at 398 ("To determine whether a seizure was objectively reasonable, and thus whether an injury is cognizable, we ask whether the *totality of the circumstances* justified that particular sort of search or seizure.") (emphasis added) (quotation and citation omitted); *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) ("[T]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.") (quotation and citation omitted). The Officer Defendants argue that the relevant inquiry is "whether the force used to effect th[e] seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the

circumstances." *Dickerson v, McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quotation and citations omitted). The Court is not suggesting that it was unreasonable for the Officer Defendants to attempt to take Meadours into custody; but there does exist a genuine issue of material fact as to whether the force they utilized to do so was unreasonable. The Court simply cannot state as a matter of law that the Officer Defendants' use of force was objectively reasonable under these circumstances. Therefore, Plaintiffs have sufficiently alleged facts to establish that the Officer Defendants caused the violation of a constitutional right.

### B.  Clearly Established Law

The Court must next determine whether the right was clearly established at the time of the conduct in question. This means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 201-02 (quotation and citation omitted). The central concept of this inquiry is whether prior decisions gave reasonable warning that the conduct at issue violated constitutional rights. *Flores*, 381 F.3d at 400. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). In this case, the Court asks whether, in light of clearly established law and the information the officers possessed, *see id.*, reasonable officers could have believed that it was lawful to use deadly force against a mentally disturbed man in order to take him into custody to get him mental health assistance.

14

First, the law is clearly established that an officer can use deadly force only when he has probable cause to believe that a suspect poses a threat of death or serious harm to the officer or others. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (citing *Garner*, 471 U.S. at 11). Second, the law is clear that "deadly force" is force "carrying with it a substantial risk of causing death or serious bodily harm." *Id*. (quotation and citation omitted).

The Officer Defendants were aware that Meadours was not a criminal, was not suspected of any crime, did not make any statements that he was going to harm himself or anyone else, and was mentally disturbed. They were there to help Meadours get mental health assistance. Plaintiffs have presented evidence that Ermel was aware that use of the beanbag shotgun could cause death or serious bodily harm, and therefore knew he was employing deadly force when he fired at Meadours. Furthermore, there is evidence that an actual pistol shot knocked Meadours off of the dog house, prompting him to run for cover, at which point Dalton, Kominek, and Martin shot him to death. In light of existing law and the knowledge the officers possessed, it was clearly established that the use of deadly force against Meadours violated the Fourth Amendment.

Because the constitutional right in question was clearly established and because there is a genuine issue of material fact as to whether the use of force was objectively reasonable, the Officer Defendants are not entitled to qualified immunity.

## VI. STATE LAW CLAIMS

The Officer Defendants also move for summary judgment on Plaintiffs' state law claims against them. The Officer Defendants argue that: (1) they are entitled to official immunity under Texas law; (2) section 101.106 of the Texas Civil Practice & Remedies Code bars Plaintiffs' tort claims; and (3) Raterink cannot prove her claim for bystander recovery.

### A.  Official Immunity

Under Texas law, "[g]overnment employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority."  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).  Official immunity is an affirmative defense; thus the Officer Defendants bear the burden of establishing all elements of the defense.  *Id*.

The "good faith" element of the official immunity test is evaluated under the same standard that federal courts use for qualified immunity determinations under § 1983.  *Mowbray v. Cameron County*, 274 F.3d 269, 280 (5th Cir. 2001).  "Texas courts look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred."  *Id*. (quotation and citation omitted).  The Officer Defendants have not shown that they acted in good faith when they killed Meadours, thus they have not proven their affirmative defense of official immunity.

### B.  Section 101.106

The Officer Defendants next contend that section 101.106 prevents Plaintiffs from bringing their state law tort claims of gross negligence, assault and battery, and intentional infliction of emotional distress.  Section 101.106 applies to suits filed under the Texas Tort Claims Act.  *See* Tex. Civ. Prac. & Rem. Code § 101.106.  The Texas Tort Claims Act, however, does not encompass intentional torts.  *Id*. at § 101.057(2).

Assault, battery, and the intentional infliction of emotional distress are clearly intentional torts.  *See id*.  Texas courts have also consistently held that claims of excessive force by police officers sound in intentional tort.  *See Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580

16

(Tex. 2001) (holding that a claim that an officer was negligent in ignoring police procedure was an intentional tort).  Because Plaintiffs only bring state law claims for intentional torts, which do not fall under the Texas Tort Claims Act, section 101.106 is inapplicable.[6]

### C.  Bystander Recovery

Finally, the Officer Defendants argue that Raterink cannot prevail on her bystander claim. In Texas, bystander recovery "requires the bystander's presence when the injury occurred and the contemporaneous perception of the accident."  *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 578 (5th Cir. 2001) (quotation and citation omitted).  Raterink admits that when she first heard the gunshots, her initial thought was that, based on the number of shots she heard, Meadours had shot all the officers.  She did not realize her brother had been the person shot until fifteen minutes later, when she saw the paramedics attending to someone and noticed the four officers still standing at the scene.  Raterink cannot recover on her bystander claim because she has failed to allege facts showing that she contemporaneously perceived the accident.  The Officer Defendants are entitled to summary judgment on this claim.

---

[6] The Officer Defendants rely on *Liu v. City of San Antonio*, 88 S.W.3d 737, 744 (Tex. App. – San Antonio 2002, pet. denied) for the proposition that the section 101.106 bar can apply to intentional torts.  *Liu*, however, was decided before the revised section 101.106 took effect in September 2003.  As a fellow district court explained:

> *Liu* held that a dismissal of the governmental entity on immunity grounds required dismissal of the governmental employee under section 101.106.  *Liu* and *Newman* were construing the previous version of section 101.106, however.  That version provided that "a *judgment* in an action or a settlement of a claim under this chapter bars any action involving the same subject matter by the claimant against the employee of the governmental unit whose act or omission gave rise to the claim."  Acts 2003, 78th Leg., ch. 204 rewrote section 101.106 into its current form and (perhaps unwittingly) eliminated the language that had been interpreted as granting immunity to governmental employees upon the dismissal of the governmental entity on immunity grounds. Under this reading of the current version of section 101.106, a plaintiff may proceed with a claim for an intentional tort against the governmental employee, even if the governmental entity has been dismissed on immunity grounds.  Therefore, Plaintiff may proceed with his battery and intentional infliction of emotional distress claims against [an officer], even though those claims are barred against the City.

*Rogers v. Bonnette*, 2005 U.S. Dist. LEXIS 13497 at *7-8 (W.D. Tex. July 5, 2005) (citations omitted).

**VII.   CONCLUSION**

Plaintiffs' Motion for Discovery Sanctions (Doc. #74) is **DENIED**.   Defendants' Objections to Plaintiffs' Summary Judgment Record (Doc. #83) are **DENIED**.   Plaintiffs' *Daubert* Motion to Exclude Testimony of Dr. Gary Deegear (Doc. #73) is **GRANTED**. Defendant City of La Porte's Motion for Summary Judgment (Doc. #61) is **GRANTED**.

The Officer Defendants' Motion for Summary Judgment (Doc. #62) is **GRANTED IN PART** and **DENIED IN PART**.  The Officer Defendants have shown that they are entitled to judgment as a matter of law on Raterink's bystander claim; this claim is therefore **DISMISSED WITH PREJUDICE**.  Plaintiffs have demonstrated that the Officer Defendants are not entitled to qualified immunity on the § 1983 claim of excessive force, or official immunity on the remaining state law claims; summary judgment on these claims is therefore **DENIED**.

IT IS SO ORDERED.

SIGNED this 10th day of August, 2005.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**